IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TRAVIS GRAHAM, *Plaintiff,* vs. CITY OF LONE GROVE, OKLAHOMA, *et al.*, *Defendants.* | Case No. 19-CV-00298-JFH |

**MEMORANDUM AND ORDER**

Before the Court is Plaintiff Travis Graham's Motion for Sanctions for Spoliation of Evidence (Doc. 167). Plaintiff asks the Court to impose severe sanctions on Defendants Gilbert Hensley, the City of Lone Grove, and Chief of Lone Grove Police Robert Oldham (collectively, "Lone Grove Defendants") related to the loss of body-worn camera ("bodycam") footage of the confrontation between Plaintiff and Officer Hensley. The Lone Grove Defendants respond that sanctions are inappropriate, as the evidence suggests no intent or even negligence in the loss of the footage. For the reasons laid out below, the Court agrees that the Lone Grove Defendants did not intentionally spoliate evidence, but finds, at least with respect to the City of Lone Grove and Chief Oldham, that these Defendants did fail to take reasonable steps to preserve evidence. However, because Plaintiff is not prejudiced by the loss, sanctions are inappropriate.

I.         **Factual and Procedural Background**

This is a civil rights action by Plaintiff under 42 U.S.C. § 1983. He alleges various constitutional violations against Defendants, seeking redress for the injuries he suffered as a result of an officer-involved shooting. Officer Hensley, of the Lone Grove Police Department ("LGPD"), and Defendant Deputy David Jones, of the Carter County Sheriff's Office, visited Plaintiff's residence as part of a welfare check after receiving information that Plaintiff was suicidal. This visit ultimately escalated into a confrontation when Plaintiff arrived at the door with a firearm. Officer Hensley shot Plaintiff within a few seconds of Plaintiff's opening the door—which he allegedly did by kicking or slamming it outwards. The facts surrounding this shooting are hotly contested, including whether Officer Hensley identified himself and whether Plaintiff was pointing the gun outward when he opened the door or whether he merely had the gun at his side.

Officer Hensley was wearing a bodycam at the time of the shooting. It is unclear precisely when Officer Hensley pressed the "record" button on the body cam, but at his deposition, he testified that as he was "putting [his] bodycam on," "the door is kicked open." The video, which lasts only two to three seconds, shows Officer Hensley and Deputy Jones with weapons drawn and aimed at Plaintiff. Plaintiff is standing in his doorway, semi-nude, with his right arm raised out of the door. The lighting and quality of the video precludes a definite conclusion as to whether Plaintiff had a gun in his right hand.

Officer Hensley provided the bodycam to Captain Stephen Holland, his supervisor, upon his return to the LGPD headquarters after the shooting. The bodycam footage was then uploaded to the LGPD's dedicated bodycam computer, saved to external drives, and was further copied and immediately provided to the Oklahoma State Bureau of Investigation ("OSBI"). Though the

encounter undoubtedly endured longer than two to three seconds, it is undisputed the bodycam malfunctioned, as it had been malfunctioning for some time prior to the incident, and thus much of the footage following the initiation of the recording is unavailable.

Plaintiff, though he bemoans the malfunction, does not seek sanctions on the basis that the Lone Grove Defendants are somehow responsible for it. Instead, he takes issue with what he believes was the intentional spoliation of *additional* footage produced by the bodycam, which he believes showed key events *prior to* the shooting.

The possible existence of this additional footage first came to light during the deposition of Officer Brittani Armstrong, several years into this litigation. Officer Armstrong testified that she viewed the bodycam footage the day following the shooting. As part of the footage she viewed, Officer Armstrong saw Officer Hensley "click" on the camera. She testified that the footage then showed the door go from closed to open, and showed Plaintiff point a gun. Officer Hensley's clicking the camera on and the door opening are not part of the three second video provided as part of discovery. Officer Armstrong testified she and Chief Oldham watched the video approximately 30 times. She further testified that Officer Hensley was not present when she and Chief Oldham viewed the footage.

Chief Oldham also testified to seeing this footage. He testified that he, Officer Armstrong, and Officer Hensley[1] viewed footage showing the front door of Plaintiff's residence "fly open," after which Plaintiff pointed his gun at Officer Hensley. He says that the video also showed Plaintiff's "right hand kind of go back and you can see the gun fly out of his hand, back into the

---

[1] The Court agrees with Officer Hensley that this is likely a mistaken recollection. Officer Armstrong, when asked, specifically disclaimed that Officer Hensley was present when she viewed the footage, and Officer Hensley has twice testified that he has only ever seen the truncated footage.

house, and the subject falls in." These last events are not shown on available three second video. Chief Oldham testified that the footage was approximately six to eight seconds long.

Several notes regarding this additional footage are relevant. First, both Officer Armstrong and Chief Oldham testified that the footage did not include audio, much like the available three seconds of video. Second, both testified that the video showed Plaintiff pointing the gun in his right hand. The Court has already noted that the available video shows Plaintiff with his right arm extended out of the doorway, but that the lighting makes it difficult to identify whether Plaintiff is holding a gun in his right hand. It is unclear whether Officer Armstrong and Chief Oldham, in testifying that they saw Plaintiff point the gun, saw clearer footage than is now available, or that this was merely their interpretation on the unclear footage.

To follow the Lone Grove Defendants' explanation for the discrepancy between the six to eight seconds of footage and the three second video produced in discovery, a basic understanding of the bodycam used is necessary. The bodycam used by the LGPD at the time was a Watchguard Vista model, which has several relevant operational features. To start, this model of bodycam includes a feature called "Record After the Fact," which causes the bodycam to continuously capture video any time the camera is "awake." Though the bodycam is continuously recording, not all of this footage is necessarily saved. This distinction may not make a great deal of sense semantically; how can footage be recorded but not saved? The answer is that the footage is recorded and stored on the camera's disc space, but as new footage is recorded, old footage will eventually be overwritten depending on the storage capabilities of the camera. Footage *can be* protected from being overwritten, however, by being designated as an "event."

An event is started when the officer presses the "record" button on the bodycam and ended by pressing the button again. If the camera is set up for "Pre-Event Capture," which allows the

camera to capture and save footage up to two minutes prior to the start of an event, this pre-event footage will also automatically be included as part of the event. Footage recorded as part of "Record after the Fact" that has not yet been overwritten may also be manually saved as part of an event after the fact.

An analysis of the LGPD bodycam completed by Avansic, a third-party computer forensics company, several years after the incident suggests that LGPD did not have "Pre-Event Capture" enabled. But this does not mean that pre-event footage was not viewable. As noted above, LGPD bodycams are programmed to record whenever they are awake. Thus, pre-event footage may be viewable when the camera is connected to a computer so long as the footage has not yet been overwritten.

Finally, we arrive at the Lone Grove Defendants explanation for why at least two of its employees viewed bodycam footage that was longer, by several seconds, than the footage it gave to OSBI and produced in discovery in this case. Simply put, the additional footage showed the several seconds captured before Officer Hensley pressed the "record" button. It was captured because the LGPD had "Record After the Fact" enabled, but it was not saved as part of the event file because the "Pre-Event Recording" function was not enabled. When the bodycam was connected to a computer, the footage was viewable but was not protected from being overwritten as it was not a part of the event file. Nor was the non-event footage automatically uploaded to the LGPD computer, as the event footage would have been. Lance Watson, Avansic's COO, avers that it would be possible for a person viewing the footage to not realize it is not saved as part of an event, as "the system does not make it obvious that the viewed data has not been preserved." Ultimately, because the footage was not saved as part of the event, it became unrecoverable due to the camera's malfunction.

The Lone Grove Defendants also tasked Avansic with locating the additional video viewed by Officer Armstrong and Chief Oldham. Watson avers that he searched though LGPD data—including the dedicated bodycam computer hard drive, the bodycam itself, and the cloud backup—and has found no additional video files related to the officer-involved shooting.

Plaintiff previously asked the Court to compel the Lone Grove Defendants to produce the additional video footage. Finding no reason to doubt the sincerity of the Lone Grove Defendants' efforts to obtain the additional video and that there was no evidence additional footage existed, the Court denied the motion. Plaintiff now moves the Court to sanction the Lone Grove Defendants for intentional spoliation of the additional footage.

## II.     Legal Standard

The Federal Rules of Civil Procedure govern the failure to preserve electronic information. Rule 37(e) applies when "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it" and now cannot be restored or replaced. "Upon finding prejudice to another party" from the loss, the Court "may order measures no greater than necessary to cure the prejudice."[2]

Plaintiff here requests that the Court enter a default judgment against the Lone Grove Defendants. In the alternative, Plaintiff requests the Court impose a number of lesser—but still severe—sanctions, including an adverse inference instruction against Defendants at trial. Under the Federal Rules, the severe sanctions of default or an adverse inference instruction are only available "upon finding that the party acted with the intent to deprive another party of the

---

[2] Fed. R. Civ. P. 37(e)(1).

information's use in the litigation."[3]  The party moving for sanctions has the burden of proving that the requirements of Rule 37(e) are met.[4]

### III.  Analysis

First and foremost, Plaintiff asks the Court for the severe sanctions of either a default judgment against the Lone Grove Defendants or an adverse inference instruction to the jury at trial. Alternatively, Plaintiff asks the Court to impose lesser sanctions.  Defendants do not appear to dispute that the video should have been preserved in anticipation of litigation, or that it cannot be restored or replaced.[5]  The Court thus focuses its analysis on whether Plaintiff has met his burden of proof to warrant either the severe sanctions under Rule 37(e)(2), or the lesser sanctions available based on a failure to preserve the video.

**A.     Sanctions of Default Judgment or Adverse Inference Instruction**

Plaintiff has not met his burden of proof to warrant the extreme sanctions of a default judgment or an adverse inference instruction.  As noted above, the Court may only order these sanctions "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation."[6]  The evidence before this Court does not support such a finding.

Plaintiff attempts to meet his burden by discussing all instances, from the initiation of the litigation until the deposition of Officer Armstrong, that he believes Defendants should have

---

[3] Fed. R. Civ. P. 37(e)(2).

[4] *F.T.C. v. Affiliate Strategies, Inc.*, 2011 WL 2084147, at *3 (D. Kan. 2011) (citation omitted).

[5] *Stovall v. Brykan Legends, LLC*, 2019 WL 480559, at *2 (D. Kan. 2019) ("Rule 37(e) permits the court to sanction the loss of ESI only if (1) the ESI should have been preserved, (2) a party failed to take "reasonable steps" to preserve it, and (3) it cannot be restored or replaced.").

[6] Fed. R. Civ. P. 37(e)(2)(A)–(C).

disclosed and produced the additional video footage but failed to do so in order to conceal it. But Plaintiff has provided no evidence to indicate that Defendants *knew* the footage was not included in the video they turned over to OSBI and as part of discovery, and further has no evidence that Defendants intended to keep the additional pre-event footage from being disclosed and produced.

The evidence presented tells a decidedly different tale. Lance Watson, in his affidavit, makes clear that the additional footage at issue was most likely viewable by the officers because of the Record After the Fact function, rather than the Pre-Event Capture function, as every indication is that LGPD did not have Pre-Event Capture enabled.[7] Footage recorded as part of Record After the Fact would have been viewable along with the event footage created by Officer Hensley's pressing the record button, but it would not have been saved and preserved in the same event file. It seems that it could have been added to the event file manually, but this would have required the viewers to realize such action was necessary to save the additional footage. Watson's review of the system suggests viewers would not have known part of the footage was not saved, and thus would not have known to manually do so.

All indications, then, are that the failure to produce the additional footage was brought about by a lack of understanding of the intricacies of the Watchguard system. Those persons watching the video did not realize that part of the video was not included as part of the file that was downloaded and saved. And thus, even though the additional footage was lost sometime thereafter— either due to the camera's normal processes of overwriting everything except event footage or due to the malfunction— there is no indication that Defendants intended for those three

---

[7] Plaintiff urges the Court to disregard this evidence, based on the fact that Mr. Watson reviewed the bodycam and came to the conclusion that Pre-Event Capture was not enabled roughly two and a half years after the shooting. But Plaintiff, though bearing the burden, has provided no evidence from which the Court could conclude that Pre-Event Capture *was* enabled and thus this footage was or should have been automatically saved.

to five seconds of video to be lost.[8]  Plaintiff does not provide sufficient evidence for the Court to conclude otherwise.  The Lone Grove Defendants' actions do not rise to the level of an "intent to deprive" Plaintiff of the footage.  Thus, the most severe sanctions of a default judgment against the Lone Grove Defendants or an adverse inference instruction are unwarranted.

**B.     Lesser Sanctions**

An altogether separate question is whether the Lone Grove Defendants, excluding Officer Hensley,[9] "failed to take reasonable steps to preserve" the additional video, as necessary to warrant the imposition of lesser sanctions.  The LGPD obviously took appropriate steps when it uploaded the bodycam footage immediately and made copies on external drives.  But Plaintiff is correct that this debacle could likely have been avoided had anyone bothered to verify whether the video files saved on the computer and on external drives actually included the full footage that several officers watched in the aftermath of the shooting.  If such verification had taken place, Defendants would have realized the footage was incomplete and, in the Court's understanding of the Watchguard bodycam system, it would have been much more likely that the pre-event footage could have been preserved.

Defendants respond that the Advisory Committee notes to Rule 37(e) provide that "perfection in preserving all relevant electronically stored information is often impossible."[10]

---

[8] Whether Defendants should have confirmed with Officer Armstrong or Chief Oldham that the entire video was present on these external drives is a question of Defendants' failure to take reasonable steps to preserve the whole video, addressed below.

[9] Officer Hensley correctly notes that federal district courts will typically only impose sanctions against "the party who had possession or control of the missing evidence." *Bush v. Bowling*, 2020 WL 5423986, at *7 (N.D. Okla. 2020) (citations omitted) (collecting cases).  Plaintiff provides no indication that Officer Hensley had possession or control over the video after he turned his bodycam over to his supervisor, and further fails to respond to Officer Hensley's argument regarding his lack of possession or control.  Therefore, the Court will not award sanctions against Officer Hensley.

[10] Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendments.

Perfection may often be impossible, especially in the case where a deluge of electronic data is relevant to impending litigation. But this case does not involve a deluge of electronic data. It involves a single video file of the events at the heart of the litigation. And even if Watchguard's convoluted system is at the heart of the loss of the additional footage, the problem could have been identified and possibly solved before the footage was lost if *anyone* had bothered to check that the video included the full footage. The Court concludes the failure to check, even once, if the video saved included the entirety of the footage constitutes a failure to take reasonable steps to preserve the video.

Sanctions based on this failure are only warranted if Plaintiff was prejudiced by the loss of the video.[11] "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation."[12] The moving party must establish " 'a reasonable possibility, based on concrete evidence rather than a fertile imagination' that access to the lost material would have produced evidence favorable to his cause."[13]

Plaintiff has failed to establish that he was prejudiced by the loss of the video. To establish prejudice, he would have to provide some indication that the lost video would have produced evidence favorable to his cause. Under the legal standards governing Plaintiff's underlying claims, this would generally have to be something that called into question Officer Hensley's "reasonableness" in his decision to pull the trigger,[14] which Officer Hensley largely pins on his

---

[11] Fed R. Civ. P. 37(e)(1).

[12] *Bush v. Bowling*, 2020 WL 5423986, at *6 (N.D. Okla. 2020).

[13] *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996) (citations omitted). *See also Turner v. Pub. Serv. Co. of Colorado*, 563 F.3d 1136, 1150 (10th Cir. 2009) (finding that "there is no evidence that Turner was 'actually, rather than merely theoretically' prejudiced by their loss.").

[14] *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (analyzing excessive force claim under the Fourth Amendment "reasonableness" standard).

belief that Plaintiff was pointing a gun in his right hand. But Plaintiff provides no evidence that anything in the lost video would refute or even call into question Officer Hensley's belief that Plaintiff was holding a gun in his outstretched right hand. All indications from persons who viewed the video before it was lost suggest that Plaintiff *was* pointing the gun outwards. The available video confirms that Plaintiff had his right arm outstretched. Plaintiff asks the Court to disregard as biased the testimony of Defendant Oldham and Officer Armstrong as to what the video showed, but even if the Court were to do so, Plaintiff, though bearing the burden, comes forward with no affirmative evidence of prejudice—that there was a reasonable possibility of evidence favorable to his cause in the lost footage.

In asking the Court to find that he was prejudiced by the loss, Plaintiff relies on the bare assertion that "Defendants destroyed or concealed the most central piece of evidence . . . and it is reasonable to infer they did so either because the video was the most damning piece of evidence or they needed to create an excuse for the actions of Defendant Hensley." As discussed above, the Court does not find that Defendants willfully destroyed or concealed the additional footage with the intent to keep it from Plaintiff, but rather that they were at most negligent in failing to check whether the full footage was downloaded and saved. This distinction is crucial because while it would have been reasonable to infer the video was damning to Defendant's case if they had intentionally destroyed it, there is no basis for the same inference in the case where Defendants were merely negligent in confirming the footage was properly saved. For this reason, the cases relied upon by Plaintiff are inapposite.[15] The Court concludes that Plaintiff has failed to provide

---

[15] *See, e.g.*, *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) ("[B]ad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that the production of the document would have been unfavorable to the party responsible for its destruction."); *McCargo v. Texas Roadhouse, Inc.*, 2011 WL 1638992 (D. Colo. 2011) (finding that the defendant acted in bad faith and that "there is no way to know exactly what

sufficient evidence that he suffered prejudice from the loss of the additional footage.  Therefore, no sanctions under Rule 37(e) are warranted against the Lone Grove Defendants.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Sanctions for Spoliation of Evidence (Doc. 167) is **DENIED.**

**IT IS SO ORDERED.**

Dated this 23rd day of June, 2022.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

evidence Defendant destroyed, and there is no way to know how to place Plaintiff back into a position where it would not suffer significant prejudice as a result of Defendant's destruction of evidence.").